As this Court is well aware, the federal sentences for drug offenses can be very, very high, and they are driven by two things, the nature of the drug and the nature of the person who is using it. In this case, the jury was given, was asked to determine the nature and quantity of the drug, and they did, in fact, answer a question saying, yes, it was more than 50 grams of crack. The problem was they were given absolutely no guidance as to how to make that determination. All they were asked to do is to answer the question of whether the substance involved was more than 50 grams of crack. The problem with that is this is a conspiracy case, and while there is no question that Frost was providing crack, selling crack to the undercover agent, there is a substantial question about what Washington knew about that. Washington, except for one sentence in Frost's testimony, Washington always provided, the evidence is that Washington always provided powder to Frost. There is, Frost says that Washington knew that he cooked it into crack for the sales, and he also says that although, at one point he says he always got powder because he liked to cook it, at another point he says that sometimes he got crack from Washington. But those statements are not corroborated, and as the government recognized in its closing argument in this case, corroboration was the key. What about the stuff that was found in Washington's house? Baking soda, cocaine, found digital sales baggies with crack cocaine in them. What do you do about that? Well, there was a box of baking soda that was found in the trash, and I baked cookies for my son yesterday, and there's a box of baking soda in my trash. Remain silent? No, I'm kidding. Well, let me back up and say, I'm not suggesting that the evidence, had the jury been properly instructed and made a finding that Washington either provided crack sometimes to Frost or that he was, he knew or it was reasonably foreseeable that Frost was cooking it into crack, that the evidence would be insufficient to support that finding. That's not my argument. My argument is that the jury wasn't properly instructed. In fact, they were not instructed at all on the issue. And what we know is that the jury had a very, very difficult time with this issue, that they came back and said that they had been intensely debating this very issue for five hours and could not come to an agreement. And still the Court gave them no guidance as to how they were supposed to reach this issue. But the issue wasn't preserved, right? It's before us on a plain error? It is on plain error. And so doesn't that require that we analyze the record? And so issues about what was found in the question, the stuff that was found in his apartment and the concession that you just made, wouldn't that vitiate a finding of plain error? Oh, no. Because that's for the jury to decide. The error here is the issue was taken away from the jury because they weren't properly instructed. It's not for this Court to look at the evidence and decide, well, the jury could have found it and so that would be okay. Well, the plain error standard is that the error was plain, that it affected substantial rights and seriously affected the fairness, integrity, et cetera. So the question is whether this is essentially a mega-harmless error analysis. Well, what this Court has held about plain error and that last provision of it is when the evidence is overwhelming that you can say it isn't plain error. The evidence here isn't overwhelming at all. The evidence is frost with a box of baking soda and a couple of baggies with residue in them in Washington's house, in his garbage, outside his house, where incidentally frost was supposed to be doing a back was in fact doing, not fast enough apparently, but doing a backyard project for Washington. And so there's, I mean, there would be plenty of reason to believe that that garbage belonged to frost and not to Washington. But the point. But no cookies in the garbage, right? Pardon me? No cookies in the garbage, right? But the point that. I mean, what would be the reasonable inference from, I mean, the jury could draw that inference, couldn't it? The jury could draw that inference. But, you know, as you've been talking in the prior cases, they could draw another inference, too, and it's not up to this Court to draw that inference. The evidence against Washington as to whether he was involved in a conspiracy to sell cocaine is in fact overwhelming. I concede that. The evidence as to whether he was involved in a conspiracy where he knew or it was reasonably foreseeable that it was crack is far from overwhelming. And even if this Court looked at it and thought, well, gee, it seems overwhelming to me, I think what's quite clear is that it was not overwhelming to at least some of the jurors, that they had debated this issue intensely, according to their note, for five issues and could for five hours and could not come to a conclusion. And so I don't think the Court can reach a conclusion based on this record, given the jury's question and what we know about what they were having trouble with, to say that the evidence that Washington knew or it was reasonably foreseeable that it was crack is so overwhelming that it doesn't satisfy the plain error standard. You have about three minutes left, Your Honor.  Good morning, Your Honors. May it please the Court. Phil Ferrari for the United States. I think that on both issues in this case, but particularly the first, the fact that we are reviewing for plain error really does settle the matter. We don't concede that there was error in the first place because the Banuelos case requires a finding that we believe is, in fact, found within the jury's verdict. The special verdict form required them to find that Washington conspired to distribute a controlled substance, and they further found that that substance was more than 50 grams of crack. And they were told, not just generally, but indeed with respect to that particular quantity, that their finding had to be beyond a reasonable doubt. So we submit that, in fact, there was no error in not instructing on Banuelos in this case. But even if this Court finds that there was, we disagree with Washington's characterization of the evidence in this case. We believe it was overwhelming, it was uncontradicted, and, in fact, it was undisputed. The evidence was that Frost was a crack dealer and that Washington, his supplier, who was providing him the cocaine, be it in crack or powder format, on credit, expecting to be paid after the subsequent sale was made, knew that he was a crack dealer. And the testimony that Frost gave on the evidence in support of this was much more extensive than simply the baggies with the crack found in the trash. But the jury's determination would have depended 100 percent on finding Frost credible, virtually. I mean, apart from the stuff that was in Washington's house. The government's case rested principally on the credibility of Frost. Well, I would say that on this particular issue, Your Honor, in terms of whether or not he knew that crack was being provided, I would say that that is a fair statement. But I would add that Frost's testimony was corroborated in a number of respects in support of that issue. I think that one of the things that supports the fact that Washington would know that with what he was giving him is the nature of their relationship. Frost's testimony was that he was dealing crack every day, that he was picking up additional supplies from Washington almost every day. The phone records support this. We introduced phone records from August of 2005 to the start of March of 2006. Those phone records were only partial. They only showed Washington's outgoing calls. On average, Washington was calling Frost more than twice every single day. Frost testified that he had known Washington and had been receiving crack from him, either for resale or his own use, for 20 years. This was corroborated by a recorded telephone call during the course of the conspiracy where Frost explained why they were taking their time. He said, we had known each other for 20 years and we like to keep things safe. Frost specifically testified that the U.C. was a customer that was specifically discussed with Mr. Washington. This is not surprising because Frost said that the U.C. was one of the few customers that wanted large amounts of weight when he ordered. This was corroborated by a recorded telephone call that was introduced in evidence where Frost actually thought he was calling Washington. And that call indicated that, indeed, they were talking about the U.C. as a customer. There are two issues. One is whether he knew he was or whether it was foreseeable that the cocaine he was providing would be turned into crack by Frost. The other is the amount. And huge, huge time hinges on the finding of the amount, right? I mean, whether it is the 50 grams of crack or whether it is, is it 500 grams of powder makes a huge difference. So the question may not be only did Washington know that Frost was dealing some crack. One issue is, did Washington, was it reasonably foreseeable that Frost was dealing that amount of crack? Well, Your Honor, first of all, in terms of the 50-gram-of-crack mark, we came just in time to the fact that there were 496 grams of crack that were purchased from Mr. Frost over the course of this conspiracy. In fact, there was more than that, but we didn't charge the two buys that occurred in August and September of 2005, because I didn't have phone records that specifically   matched Washington up with those particular purchases. But so just during 2006, we had just shy of 500 grams of actual crack. Indeed, there were four individual purchases made from Frost that by themselves went beyond the 50-gram mark. I started earlier by saying that this evidence was not contradicted, and it was not. The defendant indicates that, well, the fact that Frost said that he cooked every time before he provided it to the U.C. contradicts the idea that he was getting crack from Mr. Washington, but it doesn't, because Frost was clear that regardless of whether he got powder or crack from Washington, he would recook it to try to remove the impurities before he provided that to the U.C. It also, Your Honor, this issue was not disputed at trial. The cross-examination of Mr. Frost can be found at pages 483 to 576 of the reporter's transcript, and then there's a brief question at page 579. Not once is Mr. Frost cross-examined on the issue of either whether or not Mr. Washington was providing him crack as well as powder, nor is he ever cross-examined on the issue of whether or not Mr. Washington knew that Frost was ultimately providing crack. That doesn't make any sense. That's the government's burden. That's correct, Your Honor. And indeed, we questioned him on those topics extensively. The point that I'm trying to make is that this issue was not disputed. That's right, Your Honor. That's right. That is all that I have on the first issue. I note that in the first argument we didn't touch the Allen charge. No. She ran out of time, but that doesn't mean we're not interested in it. She's going to have some time for a bottle, so why don't you get to the Allen issue? Your Honor, I think that the defendant concedes that this is not a formal Allen charge, that at most it's a de facto Allen charge. And I think that you were the trial attorney, right? Yes, I was, Your Honor. So you, as I understand it, maybe you can clarify, you and defense counsel agreed in the court that there was not going to be an Allen charge. And then the judge calls everybody back in and gives what amounts to, looks to me like an Allen charge. Or maybe Allen-like, but it's, you know, it's arguably an Allen charge. I disagree very strongly. And indeed, apparently defense counsel did as too. You're correct. Everyone brought up the fact that we did not want an Allen charge given before it was  given. Immediately after the charge was given, the court specifically gave counsel an opportunity on the record to put any objections to how he had instructed the jury. Everyone declined. The reason was this instruction was neither an Allen charge nor was it coercive at all. The court asked the jury to return to Delilbury further. He didn't ask any jurors to reexamine the reasonableness of their views, which is the hallmark of an Allen charge. With that missing, this is not an Allen charge. You did say, well, this is costful. We've been at this a long time. This has cost money. It's a rethink. Take a little break. Take a walk. I mean, it's pretty close to an Allen charge. Your Honor, I disagree with that again. When the judge said that I want you to go back and deliberate in light of the amount of evidence that has come into this case, in light of the amount of days that the case has taken, I simply explained, look, there's a lot to process. I mean, the jury came back on this. You didn't say there's a lot to process. But that's what he was – what the judge did not do. He did not mention any cost and effort that went into this trial. He did not mention the possibility of a second trial, the fact that there may be additional costs and effort in a second trial. He simply was explaining why it was he wanted them to continue deliberations further. And without more, I – So does this hinge on whether we consider it to be an Allen charge or not? It does not because, of course – Obviously, if we construe it to be an Allen type of charge, then there was a critical omission of the fact that – urging the jurors not to give up their firmly held beliefs. Well, as an initial matter, if – I think that the – the reason that that would matter is if, in fact, this had been a traditional Allen charge. Now, of course, the defendant's not asking that. But I think the – the defendant's actually saying, no, this is a de facto Allen charge. But I think the reason that's relevant is, if this had been a traditional Allen charge, then the Court would have instructed the individual jurors to reexamine the reasonableness of their views. If he had made that request, then, yes, we would want that ameliorative language where he says, don't surrender your conscientiously held beliefs. But because he didn't ask them to reexamine their beliefs in the first instance, there was no reason to add that ameliorative language. The question is whether this line is Allen-ish. Again, the five hours of intense debate, I recognize that that can be very trying. Quote, But in the light of the overall amount of time that has been put into this case, I'm not prepared to do that at this time. That's not an insinuation about resources and all of the kinds of things that Allen charges are concerned about? I don't believe so, Your Honor. I don't believe that's a fair reading of that. I think that's just explaining to the jury why it is he wants them to spend more time deliberating. Attempt to reach a – I want you to come back and attempt to reach a unanimous verdict, if you can. Five hours of intense debate, I recognize this could be trying. I'm going to ask you to go back and deliberate. Something else that might alter your schedule and give you a different perspective. That's kind of Allen-ish, isn't it? Well, Your Honor, he's asking him to look at the – he's asking him maybe to look at the facts in a new light. If it's Allen-ish, it's just very slightly Allen-ish. It's not asking jurors to reflect on the fact that perhaps the majority is reaching a different conclusion and, therefore, they're being more reasonable than the holdouts are, which is what's at the heart of the actual Allen charge. And I would note that, in fact, the ameliorative language that we referred to earlier, the don't surrender, you're consciously held police, that instruction actually was given to the jury in the initial instructions. They were given the model instruction. And Judge England sends the jury instructions to the jury room with the jurors. So they had that instruction with them in the jury room throughout deliberations. Any further questions? Judge Fletcher, do you have a question? No. Thank you. Thank you, Your Honors. These issues, of course, are entirely related because we know at the time the Court gave that instruction, that the only issue the jury had left and had already debated on intensely was the issue of nature and quantity of the offense. That – and I would note that I think the Court has pointed out most of the things that I would note about the instruction, but the judge specifically said, because of the length of this trial, I am not prepared to declare a mistrial. And then he went on. And, yes, I agree it's not the standard Allen instruction. But this Court has repeatedly said in cases like Jimenez and others that it doesn't have to be in order to invoke the Allen analysis. And nobody has mentioned that this is virtually identical to the instruction this Court held was improper in Mason. And in that case, the Court said, yes, it's not the standard, but introducing mistrial into it is especially when you do not give the ameliorative part of the Allen instruction, is in fact error that requires reversal. So why is it plain error? It's plain error for – because that there was nothing that the Court did to make it, to back off from what the impression it gave about how this is going to be very costly and timely. Kagan. Well, but the bottom line with Allen is whether it's coercive. And essentially what he says is go have an early lunch. You know what I mean? At the bottom line is he's not saying the traditional re-examine opinions, but the bottom line was that he suggested try something new and take an early lunch. Is that coercive? Well, no. Try something new or take an early lunch is not coercive. That's not the part of the instruction that I'm arguing is coercive. What I'm arguing is coercive is that he introduced a factor into these deliberations, deliberations that were already intense without resolution. He introduced a factor that should not be considered, and then they go do what he says,  On the other issue, the government has stood up here and said Frost said, Frost said, Frost said, Frost said. I don't dispute that Frost said all of those things. If, in fact, the jury thought that Frost were as credible as the government now suggests he is, it shouldn't have taken the jury more than 5 minutes, let alone more than 5 hours of intense debate, to come to a resolution. Because by Frost's testimony, there's absolutely no question that Washington knew specifically, there's no question about the quantity, and there's no question that it was crack that he provided to, that Frost provided to the agent. So it, and it also is entirely inconsistent with the government's position at trial. The government's entire closing argument was let's put Frost aside, and then at the very end of the argument said, and even if we add Frost in, look at the corroboration. And that's important because the government has said that again today about the corroboration. The reason that I was willing to concede that the evidence that Washington was engaged in a cocaine conspiracy with Frost is overwhelming is because of all the corroboration that some conspiracy existed. I agree that all of those phone records show that every time Frost was dealing with the agent, he was then calling Washington, he was then going to visit Washington, he would get something for Washington. Now, quite interestingly, the government ignores that, and they followed Frost, and they saw that he went to his girlfriend's house and he cooked it up, which corroborates not Frost that this was about crack, but that he was getting powder from Washington. And so the evidence is far from overwhelming on the only issue that I'm arguing about, which is the quantity. And when the government says that the jury made a finding, it's important to remember what that finding is. The jury was asked one question. Do you find the substance involved was more than 50 grams of crack? There's no question if you look at the whole range of stuff here that there was more than 50 grams of crack involved in this whole conspiracy. What they weren't told is for Washington to be responsible for the crack or the amount of crack. He had to either have agreed to that or it had to be reasonably foreseeable. Thank you, counsel. Thank you. The case, as heard, will be submitted for decision. Thank you both for your arguments.
judges: Gertner, Fletcher B. , Thomas